**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **United States of America** *ex rel.* | ) | |
| **CHRISTOPHER PARKER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 09 C 4231** |
| | ) | |
| **NEDRA CHANDLER, Warden,** | ) | |
| **Dixon Correctional Center,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

An Illinois jury convicted Christopher Parker of first degree murder and aggravated battery of a child in connection with the death of two-year-old Joshua Sandifer. The trial judge sentenced Parker to a fifty-five year prison term.

Parker has petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Parker contends that his trial and appellate counsel rendered ineffective assistance; the prosecutor made improper remarks in closing argument; and the trial court erred by appointing co-counsel for his trial, failing to hear and appoint counsel on a motion claiming ineffective assistance of retained counsel, and allowing the prosecution to introduce evidence of prior bad acts. For the reasons stated below, the Court denies Parker's petition and also denies a certificate of appealability.

### Facts

The following is a summary of the relevant facts and procedural history of this

case, taken from the Illinois Appellate Court's decision in Parker's direct appeal and, in some instances, from the trial court record. Additional facts relevant to Parker's ineffective assistance claims are discussed later in this decision.

Parker began dating Roletta Sandifer in July 1997. By November 1997, Parker had moved into Roletta's home, and she was pregnant. At the time, Roletta lived in a two-flat building with her mother, Patricia Walker (Walker) and her sister, Patricia Sandifer (Patricia). Walker lived in an apartment on the second floor; Patricia lived in a closed-off living room and bedroom area in the basement with her four-year-old daughter, Jasmine; and Roletta lived in an apartment on the first floor with her two-year-old son, Joshua.

Parker and Joshua had a good relationship at first, but by early December 1997 it had deteriorated to the point that Joshua would cry because he did not want to be with Parker. Claiming that he wanted to bond with Joshua, Parker assumed primary responsibility for Joshua's care and prohibited Roletta or anyone else in her family from tending to him.

In December 1997, Walker and Roletta noticed injuries on Joshua. Parker explained a bruise over Joshua's eye by stating that he had fallen out of the tub. When Walker asked Parker about a burn on Joshua's face, Parker claimed that Joshua had fallen off his bed and hit the radiator.

Over a defense objection, Roletta testified about several incidents of domestic violence by Parker that took place in December 1997. Her testimony included an incident on December 28, 1997, a few days before Joshua's death. Roletta had just put Parker's son Christopher and Jasmine in a "time out" to punish them for playing roughly

with Joshua. An enfuriated Parker threw a bowl of hot soup against the floor, and the soup splashed onto Roletta's legs. She took Joshua upstairs to her mother's apartment and locked the door. Parker kicked the door and got into the apartment, demanding that Roletta put Joshua to bed. She complied, and when she rejoined Parker, he repeatedly hit her in the face and punched her in the stomach. Roletta testified that Parker said, "you think this little boy [Joshua] don't do no wrong, he just a bad ass just like the rest of them and you'll never love my son [Christopher] the way you love him." Resp. Ex. X at 1246. Parker then went upstairs to grab Joshua and returned with him to say, "look at your momma." *Id.* at 1247.

The next day, December 29, 1997, Walker noticed that Joshua appeared ill and had green blotches on his chest. Roletta thought this might be an allergic reaction to Chinese food, so she and Parker took Joshua to the hospital where she worked as a medical assistant. On the way, Parker attempted to persuade Roletta that they should not take Joshua to see a doctor. He warned that the authorities would take Joshua away from her because of a bruise on his head. When they arrived to the hospital, Parker angrily insisted they leave before a doctor examined Joshua. Roletta testified that she ultimately agreed to leave because she was afraid of Parker.

On the afternoon of December 31, 1997, Walker was watching television in the basement with Joshua in her lap, when he wet himself. Walker called for Roletta to change Joshua, but Parker responded instead and took him upstairs.

Roletta saw Parker carrying Joshua, propped up on his shoulder. When they sat on the couch in their living room, Joshua fell over and said that he felt sick. Parker asked what was wrong with him, and he made a gesture with his arms Roletta had

never seen before.  Though she was not concerned about his behavior, she sensed it was unusual.  She left the living room to lay down in the bedroom because she was feeling ill from her pregnancy.  Parker placed Joshua in bed with her.  Roletta was cradling Joshua when he said that his stomach hurt.  She told him that she would treat him when she got up.

Soon thereafter, Parker took Joshua out of the room and closed the door behind him.  Roletta testified that she fell back asleep and woke up to find Parker and Joshua in bed with her again.  She noticed that Joshua's neck looked odd, and she asked Parker to straighten out Joshua's head.  Parker moved Joshua and pulled the covers, but Roletta insisted that he did not look straight.  Parker put Joshua up against his back and insisted that Joshua was fine.  At that point, Parker and Roletta had sexual intercourse.  Moments later, Roletta noticed that Joshua was white and cold, and she started screaming.

Parker and Roletta drove Joshua to Provident Hospital.  On the way, Roletta, who was trained in CPR, attempted to resuscitate Joshua.  At the hospital, Joshua was pronounced dead on arrival.

Chicago police detectives John Griffin and David Golubiak investigated Joshua's death.  Once the police learned from the medical examiner that Joshua had died of blunt trauma inflicted within two hours of his death, the detectives and assistant state's attorney Michael O'Malley took Roletta and Parker to the police station to conduct a series of interviews.  Parker admitted during an interview that he had punched Joshua once in the stomach when Joshua cried and kicked as Parker picked him up from Roletta's bed to change him.  Parker said that Joshua calmed down, but Parker then

noticed that his eyes were wide and rolled back in his head. Moments before Roletta screamed, Parker also noticed that Joshua was struggling to breathe.

Parker signed a statement documenting his account of what had happened on December 31, 1997. The statement was consistent with the testimony given at trial by Roletta, Walker, and Patricia.

In closing argument, the prosecution argued that Parker caused the blunt trauma injuries that resulted in Joshua's death. To prove that Parker intended to kill Joshua or at least cause him great bodily harm, the prosecution focused on evidence that Parker ignored signs that Joshua was ill, hurt, and struggling to breathe moments before he died.

Defense counsel argued that Roletta was a bad mother and that Joshua died because he suffered from gross neglect. Counsel pointed out that Joshua was sick for days before his death, but Roletta never took him to a doctor. Counsel contended that Roletta's claim she left the hospital at Parker's insistence on December 29 was not credible. Counsel argued that even assuming Parker prevented Roletta from taking Joshua to the hospital, Roletta had not returned to the hospital when she and Parker separated later that evening. Through its own expert testimony, the defense also attempted to undermine the prosecution's evidence that Joshua died from blunt trauma injuries.

The jury found Parker guilty of first degree murder. As indicated earlier, the trial judge sentenced Parker to a fifty-five year prison term.

On appeal to the Illinois Appellate Court, Parker argued that: (1) the prosecution failed to prove him guilty of first degree murder beyond a reasonable doubt; (2) the trial

judge erred in failing to recuse himself *sua sponte* after reporting defense counsel to

the Attorney Registration and Disciplinary Commission and erred in appointing co-

counsel to represent Parker; (3) the prosecution improperly adduced unduly prejudicial

evidence of prior bad acts by Parker; (4) a prosecutor made improper remarks in

closing argument; and (5) the trial court erred in failing to conduct a hearing and appoint

new counsel after one of Parker's lawyers filed a post-trial motion alleging that co-

counsel was ineffective.  The appellate court rejected Parker's arguments and affirmed

his conviction.

Parker filed a timely petition for leave to appeal (PLA) in the Illinois Supreme

Court.  Parker's appointed counsel, however, raised only two of the five arguments that

Parker had presented to the appellate court.  Specifically, counsel argued that the trial

court erred in appointing co-counsel for Parker and in failing to conduct a hearing and

appoint new counsel after one of Parker's lawyers filed a post-trial motion alleging that

co-counsel was ineffective.  The court denied Parker's PLA.

Parker then filed a timely *pro se* post-conviction petition, alleging ineffective

assistance of trial and appellate counsel.  Specifically, Parker alleged that:  (1) trial

counsel were ineffective in refusing to allow him to testify at trial; (2) they were

ineffective in refusing to allow the trial court instruct the jury on the lesser included

offense of involuntary manslaughter; (3) they put forth conflicting defense strategies

and rendered ineffective assistance in failing to subject the prosecution's case to

meaningful adversarial testing; and (4) appellate counsel was ineffective for failing to

raise all of Parker's direct appeal issues in the PLA.  On July 14, 2006, the state trial

court dismissed Parker's petition on the ground that it was frivolous and patently without

6

merit and assessed costs against Parker.

Parker filed a timely notice of appeal to the Illinois Appellate Court. Counsel was appointed to represent him. Appointed counsel presented only one claim: the trial court's assessment of costs against Parker was inappropriate because the statute authorizing this was unconstitutional.

On November 9, 2007, after the prosecution had filed its response brief, Parker filed a *pro se* motion asking the court to terminate his appointed counsel and seeking an extension of time to file a *pro se* brief. Parker explained that he disagreed with appointed counsel's decision to not argue on appeal the constitutional claims he had asserted in the trial court. He asked the court to allow him to proceed *pro se* because he believed those claims had merit. He also asked the appellate court to grant him an extension of time to prepare his own *pro se* brief. On November 13, 2007, Parker filed another *pro se* motion objecting to the brief his appointed counsel had filed and again asked the court to allow him to proceed *pro se.*

On November 28, 2007, the appellate court entered an order summarily denying Parker's motions. On March 12, 2008, the court affirmed the trial court's assessment of costs.

On April 2, 2008, appointed appellate counsel filed a PLA with the Supreme Court, again arguing only the costs issue. On April 29, 2008, Parker filed, *pro se*, a supplemental PLA. He expressed concern that the issues he sought to raise in his post-conviction petition might be considered to be procedurally defaulted because his appointed counsel had refused to raise them. He argued that the trial court had erred

in dismissing his post-conviction petition without an evidentiary hearing. Parker listed the claims contained in his initial post-conviction petition but did not argue the claims. He contended that the trial court had erred in summarily dismissing his petition without determining whether it met the "gist of a constitutional claim" standard set forth in *People v. Edwards,* 197 Ill. 2d 239, 244, 757 N.E.2d 442, 445 (2001). Parker concluded by stating that he sought to file a supplemental PLA to preserve his claims for review and avoid procedural default.

Together with his supplemental PLA, Parker filed another *pro se* motion with the Illinois Supreme Court, apologizing for not filing his supplemental PLA sooner. He explained that he had no access to the prison library because the facility was locked down and his appointed appellate counsel had not communicated with him about the PLA until April 2, 2008, the day she filed the petition.

On May 12, 2008, the Illinois Supreme Court summarily denied Parker's *pro se* motion to file a supplemental PLA. On January 28, 2009, the court denied the PLA that Parker's appointed counsel had filed.

On January 23, 2009, Parker sought leave to file a second post-conviction petition, alleging that the appellate counsel appointed to represent him on his post-conviction appeal had rendered ineffective assistance by refusing to argue the claims Parker had asserted in his post-conviction petition. Parker argued that counsel had deprived him of the opportunity to seek relief on his constitutional claims and had failed to withdraw upon his request. Parker also reasserted the arguments he had made in his original post-conviction petition.

On October 9, 2009, the trial court denied Parker's leave to file a second post-

conviction petition. Parker moved to reconsider, but the court denied that motion on November 20, 2009. On December 28, 2009, Parker filed a notice of appeal. To the best of the Court's knowledge, the appeal remains pending.

On July 14, 2009, Parker filed the present petition for a writ of habeas corpus. He asserts the following claims:

1) trial counsel were ineffective for refusing to allow Parker to testify at trial;

2) trial counsel were ineffective for refusing to allow the trial court instruct the jury on involuntary manslaughter;

3) trial counsel put forth conflicting defense strategies and rendered ineffective assistance in failing to subject the prosecution's case to meaningful adversarial testing;

4) appellate counsel was ineffective for failing to raise all of Parker's direct appeal issues in the direct appeal PLA;

5) the trial court erred in failing to conduct a hearing and appoint new counsel after one of Parker's lawyers filed a post-trial motion alleging that co-counsel was ineffective;

6) the prosecutor made improper remarks in closing argument;

7) the trial court erred in appointing co-counsel to assist Parker's retained counsel; and

8) the trial court erred in allowing the prosecution to introduce evidence of prior bad acts.

Parker also asks this Court to consider staying review of his claims until the conclusion of the appeal on his second post-conviction petition.

## Discussion

**A.    Parker's stay request**

Parker's state court appeal regarding his request to file a second post-conviction

petition is pending.  He asks this Court to stay review of his habeas corpus petition until the appellate court has ruled.

As noted earlier, Parker's proposed second post-conviction petition involves only a claim that his appointed post-conviction appellate counsel rendered ineffective assistance by failing to appeal his constitutional claims.  The claim in the proposed second post-conviction petition is not one of the claims that Parker asserts here as a basis for issuance of a writ of habeas corpus.  Rather, the claim of ineffective assistance of post-conviction appellate counsel is at issue in the present case only to the extent that it is offered as a basis for excusing the procedural default of certain of the claims that Parker has made here.

A district court has the discretion, in certain circumstances, to stay consideration of a federal habeas corpus petition that includes unexhausted claims while the petitioner exhausts those claims in state court.  *See Rhines v. Weber*, 544 U.S. 269, 277 (2005).  Though Parker's habeas corpus petition does not contain any unexhausted claims as such, because his pending state court appeal concerns issues that touch on his habeas corpus petition, the considerations set forth in *Rhines* apply.  Under *Rhines*, "stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court.  Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless."  *Id.*

Parker likely meets the good cause requirement, because he tried, albeit unsuccessfully, to get his appointed post-conviction counsel to assert all of his claims

and then to get the Illinois Appellate Court and the Illinois Supreme Court to consider those claims even though counsel had not asserted them. If, however, the underlying claims that Parker wanted appellate counsel to raise lack merit for either substantive or procedural reasons, there is no good reason to grant a stay. The Court therefore proceeds to consider those claims.

**B.    Parker's claims**

A person convicted in state court may obtain a writ of habeas corpus on a claim that was adjudicated on its merits in state court only if the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(b).

A decision "is an 'unreasonable application' of clearly established federal law if it correctly identifies the governing legal principle 'but unreasonably applies it to the facts of the particular case.'" *Woods v. Schwartz,* 589 F.3d 368, 378 (7th Cir. 2009) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). The petitioner must show that the state court's decision "was so erroneous as to be objectively unreasonable." *Id.* (quotation marks and citation omitted).

A state court decision is contrary to clearly established federal law if "the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently that [the Supreme Court has] done on a set of

11

materially indistinguishable facts." *Id.* at 377 (quoting *Bell*, 535 U.S. at 694).

Finally, a state court decision is considered to be based on an unreasonable determination of the facts in light of the evidence presented if the petitioner is able to rebut, by clear and convincing evidence, the presumption of correctness that applies to state court fact-finding. *See Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

**1.      Claims 1, 2, and 3 – ineffective assistance of trial counsel**

Parker retained attorneys David Shelton, Maria Owens, and Chelsea Robinson to represent him at trial. During pretrial proceedings, the trial judge and the prosecution repeatedly raised concerns about the quality of representation Parker was receiving, in particular from Shelton. The prosecution made several motions to remove Shelton and appoint new counsel. It was brought to the judge's attention that Shelton had sent letters to Roletta and the prosecutors in which he said he had been "moved" to contact them by Joshua's spirit and asking them to tell "the Truth." Shelton said that he had contacted a spiritual advisor and a psychic to assist in learning things that Parker had not witnessed.

Prior to trial, the trial judge sent a letter to the Attorney Registration and Disciplinary Commission in which he expressed concern that Shelton might be unfit to practice law. Shelton sent a letter to the ARDC responding to the judge's letter, and the ARDC declined to pursue disciplinary action against Shelton.

Despite the trial judge's expressed concerns and the motions filed by the prosecution seeking to remove Shelton, Parker insisted in keeping Shelton as his attorney. On one of these occasions, after Parker said he wanted Shelton to remain as his attorney, Shelton noted that the prosecution had suggested that additional counsel

12

be appointed for Parker.  Shelton advised the trial judge that he had discussed the case with another attorney, David Neely, who said that he would be willing to act as co-counsel for Parker.  Shelton said that he wanted Neely to come into the case.  The trial judge thereafter appointed Neely to act as co-counsel.

Parker's first three claims involve whether defense counsel Shelton and Neely rendered effective assistance.  His first claim is that counsel did not let him testify in his own defense and gave him bad advice about whether he should testify.  His second claim is that they inappropriately would not allow the trial court to give the jury an involuntary manslaughter instruction.  His third claim is that they put forth conflicting strategies and did not subject the prosecution's case to meaningful adversarial testing.

### a.    Procedural default

Respondent argues that Parker's claims of ineffective assistance of trial counsel have been procedurally defaulted and should not be considered on their merits.  Parker asserted each of these claims in his first post-conviction petition.  Respondent argues that he defaulted the claims because he did not raise them on appeal or in his  PLA.

The fact is, however, that Parker asserted (or at least did everything he could to assert) the claims before both the Illinois Appellate Court and the Illinois Supreme Court, even though his appointed appellate counsel did not do so.  Specifically, he moved to discharge his appointed counsel and file a *pro se* brief to the appellate court asserting these claims, which appointed counsel had not raised, and he likewise attempted to supplement the PLA that appointed counsel filed on his behalf.

Both the appellate and supreme courts rebuffed Parker's efforts to pursue his claims.  But the habeas corpus statute's requirement that a petitioner exhaust state

court remedies "requires only that state prisoners give state courts a fair opportunity to act on their claims." *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (emphasis omitted). Parker gave the state courts the opportunity to act on his claims, but they declined to do so.

Respondent argues that the state courts rejected Parker's *pro se* briefs on state law grounds and that, accordingly, federal review of his claims is barred. A federal court may not consider a federal constitutional claim in a habeas corpus petition if the last state court to consider the claim declined to address it and instead decided the case "on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729 (1991).

A state law ground is independent "only if the state court actually relied on a state rule sufficient to justify its decision." *Prihoda v. McCaughtry,* 910 F.2d 1379, 1382 (7th Cir. 1990). A state ground is adequate only if the state court applies the rule "in a consistent and principled way." *Id.* at 1383. The state ground can be substantive or procedural, *Coleman,* 501 U.S. at 729, but it must be a "'firmly established and regularly followed'" state practice. *Lee v. Kemna*, 534 U.S. 362 (2002) (citing *James v. Kentucky*, 466 U.S. 341, 348 (1984)).

In this case, the courts' orders do not identify the basis for their rejection of Parker's supplemental filings. This alone may require rejection of respondent's contention that Parker procedurally defaulted these claims. *See Pole v. Randolph*, 570 F.3d 922, 937 (7th Cir. 2009) (procedural default does not bar consideration of claim unless the last state court rendering a judgment in the case clearly and expressly stated

14

that it rejected the claim based on a state procedural bar) (citing *Harris v. Reed*, 489 U.S. 255, 263 (1989)).

Even if default is appropriately considered, the Court rejects respondent's contention that Parker defaulted these claims. Parker did what he could to get the state appellate and supreme courts to consider his claims, but those courts rejected his efforts. Illinois courts have a judge-made rule against hybrid representation, that is, against acting as one's own attorney while at the same time acting through counsel. *See, e.g., People v. McDonald*, 168 Ill. 2d 420, 435, 660 N.E.2d 832, 838 (1995). The courts frequently do not follow this rule in capital cases, however, on the ground that the defendant's life is at stake. *Id.* More importantly for present purposes, the Illinois reports are replete with decisions in non-capital cases in which courts permitted defendants to file supplemental *pro se* briefs, without suggesting that this was the least bit out of the ordinary. *See, e.g., People v. Barnwell*, 285 Ill. App. 3d 981, 988, 675 N.E.2d 148, 153 (1996); *People v. Lewis*, 243 Ill. App. 3d 618, 638, 611 N.E.2d 1334, 1343 (1993); *People v. Williams*, 185 Ill. App. 3d 840, 848, 541 N.E.2d 1175, 1181 (1989) (allowing a *pro se* brief even after oral argument was held); *People v. Warren*, 183 Ill. App. 3d 197, 198, 538 N.E.2d 1380, 1381 (1989).

Illinois has no written rule barring supplemental *pro se* briefs or PLAs as Parker sought to submit in his case. There is a rule imposing page limits on appellate briefs and petitions for leave to appeal, but Parker's supplemental filings would not have caused his total filings to exceed those limits (at least there is no suggestion of that).

In short, the "rule" that the state courts followed in declining to consider Parker's supplemental *pro se* filings is not codified. And given the factors identified above, it would be difficult to say that the rule, to the extent it exists, is regularly followed and consistently applied. Given these circumstances, the Court concludes that the state court's rejection of Parker's *pro se* filings is not an adequate and independent state-law ground that bars federal review of his claims. *See Hitchcock v. Sec'y, Dept. of Corrections*, 360 Fed. Appx. 82, 84-86 (11th Cir. 2010); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997); *cf. Kizer v. Uchtman*, 165 Fed. Appx. 465, 467-68 (7th Cir. 2006) (unpublished) (concluding that petitioner satisfied "fair presentment" requirement via a supplemental *pro se* brief even though state court declined to consider it).

### b.  Merits

Parker's claims of ineffective assistance of trial counsel are governed by the two-part test established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Under this test, the defendant must first show that his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687.

The first part of the *Strickland* test requires the defendant to show that "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." *Id.* at 688. Because an array of different trial strategies exist, courts apply a presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

The second part of the *Strickland* test requires the defendant to show that "errors of counsel . . . actually had an adverse effect on the defense." *Id.* at 693. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Parker's first claim is that his lead attorney, Shelton, refused to let him testify. He also claims his decision was not intelligently made because his attorney persuaded him to waive his right to testify by giving him bad advice and that Shelton never told him that testifying was his constitutional right.

According to Parker, Shelton did not tell him he had a constitutional right to testify but rather told him that he did not need to testify because the defense team was certain of his acquittal. He says that Shelton advised him that the jury would not believe his testimony because it would know that he had prior criminal convictions. Parker asserted in an affidavit he submitted to the state court that he wanted to testify and would have done so had he known it was his absolute right.

First, Parker's contention that he did not understand his right to testify and that he wanted to testify flies in the face of the record. The record reflects that the trial judge informed Parker of his right to testify at trial and made it quite clear to Parker that the decision was his, and his alone:

> Court:      Mr. Parker, you understand you have the right to testify?
> Nobody makes you testify, it's your decision. If you want to
> testify, you get to testify. If you don't want to testify, nobody
> will make you testify. You understand that?

| | |
|---|---|
| Parker: | Yes, I understand. |
| Court: | You want to testify? |
| Parker: | No, I don't, Your Honor. |

Resp. Ex. X at 2318. The state trial judge[1] concluded that counsel did not prevent Parker from testifying and that Parker understood the right to testify, and the decision whether to exercise that right, was his. Resp. Ex. H at 5-6. The court's conclusion was not an unreasonable application of United States Supreme Court law, nor was it based on an unreasonable determination of the facts.

Parker also contended in his post-conviction petition that Shelton gave him bad advice that influenced his decision not to testify. The state trial court did not address the "bad advice" claim because it considered the constitutional right at issue to involve only a contention that Shelton had interfered with Parker's desire to testify. For this reason, this Court addresses the claim on its merits.

"[W]aiver of a defendant's Sixth Amendment rights must be made voluntarily, knowingly and intelligently." *Starkweather v. Smith*, 574 F.3d 399, 403 (7th Cir. 2009)). "*[I]ncorrect* advice that induces a defendant to waive his right to testify can constitute ineffective assistance." *Id.* (emphasis in original).

The record reflects, contrary to Parker's claim, that it was not Shelton, or at least not *just* Shelton, who advised Parker regarding whether he should testify. Neely represented to the trial court that he had "discussed the possibility of [Parker] testifying .

---

[1] The Court here applies the standard of review under section 2254(b) to the state trial court's ruling on this claim. The appellate and supreme courts did not consider the claim at all, either on its merits or on procedural grounds. The Court looks to the ruling of the last state court to have considered the claim, which in this case was the trial court.

. . and [that he and Parker] decided that he will not." Resp. Ex. X at 2317. The Court does not see in Parker's petition any contention that *Neely* misinformed him of his rights or his chances of acquittal. But even assuming both lawyers told Parker that they believed it was a bad idea for him to testify – whether because they believed he was likely to be acquitted or because they were concerned that his criminal record would be disclosed to the jury as a result – Parker has not shown that this advice would have been objectively unreasonable under the circumstances as they existed at the time.

In any event, Parker has not met *Strickland's* prejudice requirement. Parker did not explain in either his post-conviction petition, and he does not explain in his habeas corpus petition, what his testimony would have been or how it would have impacted the outcome of his trial. This is fatal to his claim. *See Barrow v. Uchtman,* 398 F.3d 597, 608, n.12 (7th Cir. 2005) ("Seventh Circuit precedent seems to support the . . . view that defendants who allege they waive their right to testify still must show that this waiver was prejudicial, i.e., that the failure to testify affected the outcome of the trial.").

**b.     Failure to submit involuntary manslaughter instruction to jury**

Parker's next contention is that Shelton refused to allow the trial court to instruct the jury on the lesser included offense of involuntary manslaughter. Again, this claim flies in the face of the record. The trial judge clearly explained to Parker that the decision was his, not his attorneys', and Parker stated that he did not want an involuntary manslaughter instruction:

The court also advised Parker that:

There are reasons why you might want to [instruct the jury of the lesser included offense] because there are lesser penalties for [involuntary

19

manslaughter]. There are reasons why you might not want to [instruct the jury on involuntary manslaughter]. [For instance,] [i]t gives the jury another chance to convict you on something they don't have to. So you have to decide [whether or not to instruct the jury on involuntary manslaughter].

Shelton requested five minutes to discuss the instruction with Parker. Following a break, the following discussion occurred:

Court:       You discussed . . . with your lawyer regarding if you want
             the jury instructed on the lesser included offense and what
             your decision is on that? That is your call also, Mr. Parker.
             That is not your lawyers's call, that is your call. You
             understand?

Parker:      Yes, I do.

. . .

Court:       You want [the instruction] or not?

Parker:      No, I don't.

Resp. Ex. X at 2316-18. In short, it was Parker, not Shelton, who made the final decision not to request an instruction on involuntary manslaughter.

Parker contends, however, that his decision was based on advice that Shelton gave him, advice that Parker attacks as incompetent. Specifically, Parker says that Shelton told him and his family that, if the involuntary manslaughter instruction was given, the jury would convict him on that offense. Parker says that Shelton told him that if he was convicted, he would never work again. He contends that Shelton said the involuntary manslaughter instruction was unnecessary because he was confident the jury would acquit Parker.

The state trial court considered and rejected Parker's claim that Shelton gave him bad advice. Accordingly, this Court does not decide the point *de novo*; rather it

asks whether the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented or unreasonably applied *Strickland* and its Supreme Court progeny. *See* 28 U.S.C. § 2254(b).

The state trial court characterized Parker's claim as implicating a strategy decision by trial counsel. Resp. Ex. H at 4. It applied *Strickland*'s presumption that counsel's performance fell within the range of reasonable assistance. *Id.* (citing *Strickland*, 466 U.S. at 690). The court declined to "second-guess[ ]" counsel's strategic decision, noting that *Strickland* requires "that every effort be made to eliminate the distorting effects of hindsight" when assessing an attorney's performance. *Id.* (citing *Strickland*, 466 U.S. at 689).

This determination was not based on an unreasonable determination of the facts, nor did it represent an unreasonable application of *Strickland*. First, advice (or even a decision) by counsel on whether to ask for a lesser-included instruction is a quintessentially strategic determination. *See, e.g., Adams v. Bertrand*, 453 F.3d 428, 435-36 (7th Cir. 2006). Second, even though the record reflected that Shelton may have expressed some odd views in connection with his representation of Parker, under *Strickland*, the performance of counsel is assessed against an objective standard, not a subjective one. *Strickland*, 466 U.S. at 687-88.

In some situations, giving the jury a lesser-included instruction may make it more likely that the jury will convict the defendant of something. That is essentially what Parker claims Shelton told him. The view that Shelton allegedly expressed, to the effect that the jury would not convict Parker of first degree murder may have turned out

to be dead wrong in hindsight.  The Court cannot say, however, that this advice was, at the time, objectively unreasonable in a case in which the claim of intentional killing was based entirely on circumstantial evidence.

> **c.  Conflicting defense strategies; failure to subject the case to meaningful adversarial testing**

Parker claims that Shelton and his team on the one hand, and Neely on the other, pursued conflicting strategies and that this resulted in ineffective assistance of counsel.  He also contends that trial counsel did not subject the prosecution's case to adversarial testing.

On post-conviction review, the trial court determined that Parker had forfeited ("waived") this claim, finding that it was based on the trial record and thus could have been argued on direct appeal.  Resp. Ex. H at 7.  This was an independent and adequate state-law ground, which precludes review of Parker's claim in the way in which he made it in his post-conviction petition and in which he makes it in this case. *See, e.g., Kaczmarek v. Rednour*, 627 F.3d 586, 592 (7th Cir. 2010).

The state trial judge also noted that the appellate court had actually dealt with a variation of Parker's claim in considering his direct appeal.  Resp. Ex. H at 7-8. Because, however, Parker did not include that claim in his direct appeal PLA, he procedurally defaulted the claim by failing to give Illinois' highest court the opportunity to address it.  *See O'Sullivan*, 526 U.S. at 845.  Parker has not shown cause for the default, because his only argument for cause is a challenge to the actions of the attorney who handled the PLA.  Ineffective assistance of counsel may constitute cause, but because a defendant does not have a constitutional right to counsel for a

discretionary appeal like a PLA, an attorney's failure to raise an argument in a PLA, even if it amounts to incompetence, cannot constitute cause. *See Anderson v. Cowan*, 227 F.3d 893, 901 (7th Cir. 2000).

**2.      Claim 4 - ineffective assistance of counsel on direct appeal**.

Parker's next claim is that the appointed attorney who handled his direct appeal was ineffective for failing to raise all of Parker's appellate issues in the PLA that counsel filed in the Illinois Supreme Court. This is not a viable federal constitutional claim, because a defendant does not have a federal constitutional right to counsel to pursue a discretionary state appeal like a PLA. *See Wainwright v. Torna*, 455 U.S. 586, 587 (1982).

**3.      Claim 5 – failure to appoint new counsel for post-trial motion**

Parker's fifth claim is that the trial judge erred in failing to appoint new counsel and hold a hearing after Neely filed the post-trial motion arguing that Shelton was ineffective. In state court, Parker did not present this argument in a way that would have alerted the state court that this was a federal constitutional claim. He therefore procedurally defaulted the claim, *see, e.g., Ward v. Jenkins*, 613 F.3d 692, 696-97 (7th Cir. 2010), and he has not shown cause or prejudice as necessary to excuse the default.

In any event, Parker has not identified any federal constitutional basis for this claim. There is no indication that Neely – the lawyer who filed the post-trial motion – rendered ineffective assistance in doing so or that he suffered from a conflict of interest in a way that would have required the judge, as a matter of Sixth Amendment law, to

appoint new counsel.

**4.      Claims 6 and 8 – improper closing argument; prior bad act evidence**

Parker's sixth and eighth claims concern his contentions that the prosecutor made improper comments during closing argument at trial and that the trial judge erred in allowing the prosecution to introduce evidence of prior bad acts.  Parker asserted these arguments in his appeal to the Illinois Appellate Court, but he did not include them in his PLA to the Illinois Supreme Court.  For the reasons described earlier, this is an unexcused procedural default that bars federal review of these claims.

**5.      Claim 7 – trial court's appointment of co-counsel for Shelton**

Parker's final claim is that the trial judge forced Neely on him and violated his constitutional right – presumably, his right to be represented by the retained counsel of his choice.  The Illinois Appellate Court considered this claim on its merits and rejected it, concluding that Neely was not, in fact, forced on either Shelton or Parker.  *See* Resp. Ex. A at 18-19.

The appellate court did not unreasonably apply federal law in rejecting this claim, nor did it find the facts unreasonably in light of the evidence.  The record reflects that the trial judge did not, in fact, force Neely on Parker.  Rather, as the Court described earlier, Shelton raised the idea of bringing Neely on and confirmed to the trial judge that he had no problem with having Neely as co-counsel.  *See* pp. 12-13 *supra.*  Parker voiced no objection to this at the time.

**Conclusion**

For the reasons stated above, the Court directs the Clerk to enter judgment in

favor of respondent on all of petitioner's claims. The Court also declines to issue a certificate of appealability, because neither the merits of the claims the Court considered on their merits, nor the procedural issues on which the Court decided the other claims, are debatable, capable of different resolution, or deserving of further consideration. See 28 U.S.C. §2253(c)(2).

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  January 24, 2011